**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| SAMHITA GERA and DENISH BHAVSAR, derivatively on behalf of BURGERFI INTERNATIONAL, INC. f/k/a OPES ACQUISITION CORP., <br><br> Plaintiffs, <br><br> v. <br><br> OPHIR STERNBERG, JULIO RAMIREZ, IAN H. BAINES, BRYAN MCGUIRE, MICHAEL RABINOVITCH, ALLISON GREENFIELD, MARTHA STEWART, GREGORY MANN, VIVIAN LOPEZ-BLANCO, ANDREW TAUB, JOSE LUIS CORDOVA VERA, DAVID BRAIN, JAMES ANDERSON, and MARTHA L. BYORUM, <br><br> Defendants, <br><br> and <br><br> BURGERFI INTERNATIONAL, INC. f/k/a OPES ACQUISITION CORP., <br><br> Nominal Defendant. | Case No: <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Samhita Gera and Denish Bhavsar ("Plaintiffs"), by Plaintiffs' undersigned

attorneys, derivatively and on behalf of Nominal Defendant BurgerFi International, Inc. f/k/a Opes

Acquisition Corp. ("BurgerFi" or the "Company"),[1] file this Verified Shareholder Derivative Complaint against Defendants Ophir Sternberg ("Sternberg"), Julio Ramirez ("Ramirez"), Ian H. Baines ("Baines"), Bryan McGuire ("McGuire"), Michael Rabinovitch ("Rabinovitch"), Allison Greenfield ("Greenfield"), Martha Stewart ("Stewart"), Gregory Mann ("Mann"), Vivian Lopez-Blanco ("Lopez-Blanco"), Andrew Taub ("Taub"), Jose Luis Cordova Vera ("Cordova Vera"), David Brain ("Brain"), James Anderson ("Anderson"), and Martha L. Byorum ("Byorum"), (together, the "Individual Defendants" and with BurgerFi, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement and/or aiding and abetting thereof and against Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BurgerFi, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1] "BurgerFi" refers to the Company after the December 2020 Merger (defined below) and name change, whereas "OPES" refers to the Company prior to the Merger and name change.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former directors and officers from June 30, 2020 to November 15, 2022, inclusive (the "Relevant Period").

2.     BurgerFi represents itself to be "a multi-brand restaurant company that develops, markets and acquires fast-casual and premium-casual dining restaurant concepts around the world, including corporate-owned stores and franchises located in the United States, Puerto Rico and Saudi Arabia." BurgerFi had 172 franchised and corporate-owned restaurants as of April 3, 2023.

3.     BurgerFi previously operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public. The Company is the result of a business combination that closed on December 17, 2020 (the "Merger") with BurgerFi International, LLC ("Legacy BurgerFi"), a private Delaware company that was purportedly "one of the nation's fastest-growing better burger concepts." Prior to the Merger, the Company was named Opes Acquisition Corp. ("OPES").

4.     Unbeknownst to the shareholders who approved the Merger (i.e., OPES's shareholders), the value of the Merger was not in line with Defendants' representations. In fact, through the Merger, OPES inherited a business vulnerable to severe challenges with its growth strategy. By making a series of false and misleading statements regarding the growth capabilities of Legacy BurgerFi, Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at OPES and Legacy

BurgerFi to the Company's detriment. The full truth remained hidden from investors until after the Merger closed and the value of the Company's securities tanked to new lows.

5.      OPES was incorporated on July 23, 2017. In November 2017, the Company issued an aggregate of 2,875,000 shares of common stock (the "Founder Shares") to Axis Public Ventures S. de R.L. de C.V. ("Axis Public Ventures"), an affiliate of Axis Capital Management (the "Sponsor"), for an aggregate purchase price of $25,000.

6.      On March 9, 2018, Axis Public Ventures transferred 2,012,500 Founder Shares to the other stockholders of the Company prior to the IPO (the "Initial Stockholders") for the same price originally paid for such shares. The Founder Shares included an aggregate of up to 375,000 shares subject to forfeiture by the Initial Stockholders to the extent that the underwriters' over-allotment was not exercised in full or in part, so that the Initial Stockholders would own 20% of the Company's issued and outstanding shares after the IPO. As the Founder Shares did not entitle the Individual Defendants to redemption rights, the Founder Shares would have expired worthless if OPES failed to timely complete a business combination.

7.      On March 16, 2018, the Company consummated its IPO, selling 10,000,000 units of its common stock and generating gross proceeds of $100,000,000.[2] Simultaneously with the closing of the IPO, the Company sold 400,000 units (the "Private Placement Units") at a price of $10.00 per unit in a private placement to Axis Public Ventures, Lion Point Capital ("Lion Point"), and the Initial Stockholders, generating gross proceeds of $4,000,000. Like the Founder Shares, because the Private Placement Units did not entitle the Individual Defendants to redemption rights,

---

[2]https://ir.burgerfi.com/sec-filings/all-sec-filings/content/0001213900-20-040068/ea130561-defm14a_opesacqu.htm#pre_013. Last visited August 28, 2023.

the Private Placement Units would have expired worthless if OPES failed to timely complete a business combination.

8.      On March 20, 2018, the Company consummated the sale of an additional 45,000 Private Placement Units at a price of $10.00 per Private Placement Unit, which were purchased by the Sponsor, generating gross proceeds of $450,000. Each Private Placement Unit consisted of one share of common stock and one warrant to purchase one share of common stock at an exercise price of $11.50. The same day, as a result of the underwriters' election to exercise their over-allotment option in full, 375,000 Founder's Shares were no longer subject to forfeiture.

9.      The proceeds from the sale of the Private Placement Units were added to the proceeds from the IPO, for total proceeds of $101,000,000, and placed in a trust account (the "Trust Account"). The Private Placement Units would have expired worthless if OPES failed to timely complete a business combination.

10.      As each of the Individual Defendants at OPES at the time had either a direct or indirect economic interest in the Founder Shares and/or Private Placement Units, they stood to profit significantly from the Merger.

11.      The Individual Defendants' profits were not guaranteed, however, as the Individual Defendants' ability to profit off their investments was subject to certain restrictions in OPES's Certificate of Incorporation and/or for those at Legacy BurgerFi or the post-Merger Company, profits were contingent on the Overpayment Misconduct (defined below) and concurrent Merger.

12.      According to OPES's Certificate of Incorporation, OPES had only 18 months from the date of the IPO's closing to complete a business combination, the failure of which would have resulted in OPES: (1) ceasing all of its operations, except those made for the purposes of winding

up the Company's affairs and liquidating; (2) redeeming public shares; and (3) dissolving and liquidating the funds held in the Trust Account to return to OPES's investors. Because each of OPES's officers and directors agreed to waive their rights to liquidating distributions from the Trust Account, the Founder Shares and Private Placement Units would have expired worthless in the event OPES failed to timely complete a business combination.

13.     In an effort to give themselves more time to complete the qualifying business combination and avoid losing out on the windfalls they would receive therefrom, between September 2019 and March 2020, the OPES Defendants solicited shareholder approval for four amendments to the Company's Certificate of Incorporation to extend the time limit for the Company to complete a merger.

14.     Accordingly, by the time merger discussions between OPES and Legacy BurgerFi began on March 18, 2020, the Individual Defendants at OPES were under immense financial and time pressure to meet OPES's deadline to complete a business combination.

15.     On June 30, 2020, the Company announced its definitive merger agreement with Legacy BurgerFi (the "Merger Agreement") and filed various proxy materials with the SEC. In the SEC filings, the Individual Defendants touted, among other things, Legacy BurgerFi's growth potential, representing to investors that OPES "believe[d] that BurgerFi [wa]s positioned for rapid growth" and was "thrilled to partner with [Legacy] BurgerFi's senior management to support the numerous growth initiatives underway[.]" In reality, a key part of the Company's growth strategy post-Merger would be through merger and acquisition ("M&A") activity—including by acquiring businesses which sold products and offerings different that those of BurgerFi—thereby subjecting BurgerFi to additional commodity fluctuation and other risk. In other words, OPES shareholders

were misled to believe that the Merger would be prosperous for them because of Legacy BurgerFi's standing as a high-quality hamburger business, which would purportedly result in a post-Merger Company with an enterprise value of $143 million. In reality, their investments in the post-Merger Company would be highly risky considering BurgerFi would engage in M&A activity shortly after the completion of the Merger, while BurgerFi was still growing and adding more of its restaurants nationwide.

16.     On December 1, 2020, OPES filed a proxy statement with the SEC (the "Merger Proxy Statement"). The Merger Proxy Statement was solicited by the Board of Directors of OPES, including Defendants Sternberg, Cordova Vera, Brain, Anderson, Byorum, and Greenfield, who, as disclosed in the Merger Proxy Statement, approved the merger agreement "after careful consideration" and recommended that OPES shareholders approve the Merger, the 2020 Omnibus Equity Incentive Plan (the "Plan"), and the election of five directors (including Defendants Sternberg, Greenfield, and Mann) to the post-Merger Company's Board. The Merger Proxy Statement represented to investors that the aggregate value of the consideration to be paid by OPES in the Merger was approximately $100 million, calculated as follows: (i) $30,000,000 in cash payable to certain members of Legacy BurgerFi; (ii) $20,000,000 payable either in cash or in 1,886,792 shares of common stock based upon a pre-determined price of $10.60 per share, in the sole and absolute discretion of the OPES board of directors; and (iii) 4,716,981 shares of OPES common stock to be issued to certain members of Legacy BurgerFi.

17.     The Merger Proxy Statement included a series of false and misleading statements which touted the value represented by the Merger and Legacy BurgerFi. In particular, the Merger Proxy Statement contained materially false and misleading statements and omissions that failed to

- 7 -

disclose, *inter alia*: (i) BurgerFi misrepresented to its pre-Merger investors what its growth strategy would be once the Merger was completed; and (ii) BurgerFi had overstated the effectiveness of its strategies for acquisition and growth. As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy Statement and statements leading up to the close of the transaction, shareholders were unaware of material undisclosed risks and were deceived into approving the unfavorable Merger instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of the Legacy BurgerFi (collectively, the "Overpayment Misconduct").

18.     On December 17, 2020, the Merger closed. By the close of trading that day, the Company's shares were trading on NASDAQ at a price of $15.71 per share.

19.     Pursuant to the terms of the Merger, the Company purchased 100% of the membership interests of Legacy BurgerFi, which resulted in Legacy BurgerFi becoming a wholly-owned subsidiary of the Company. Upon completion of the Merger, the Company changed its name to BurgerFi International, Inc. and continued to own and operate fast-casual and premium-casual restaurants throughout the country.

20.     On November 4, 2021, BurgerFi acquired Anthony's Coal Fired Pizza & Wings ("Anthony's") for $156.6 million (the "Anthony's Acquisition"), which Defendant Sternberg, Executive Chairman of the Company, touted as "a significant step forward in BurgerFi's ongoing growth strategy and transition into a premium multibrand platform."

21.     However, throughout the Relevant Period, the Individual Defendants personally made and/or caused the Company to make to the investing public a series of materially false and/or

misleading statements and omissions about the Company's growth strategy, falsely representing to investors that its strategy consisted of "operating new domestic company-operated restaurants; innovating its digital products and capabilities; growing same-store sales; thoughtfully increasing its franchised restaurants; and capitalizing on its brand awareness."

22.     The truth began to emerge on August 11, 2022 when BurgerFi issued a press release announcing its financial results for the second quarter of 2022. The press release revealed, among other things, that the Company's revenue for the second quarter of 2022 was $45.3 million, which missed consensus estimates by $2.28 million. The press release further noted that "[n]et loss in the second quarter was $60.4 million compared to a net income of $9.0 million in the year-ago quarter[,]" which "[wa]s primarily the result of goodwill impairment charges of $55.2 million in relation to BurgerFi and Anthony's coupled with higher depreciation, amortization of intangibles, share-based compensation, [and] interest expense resulting from the acquisition-related debt."

23.     On this news, the Company's stock price fell $0.10 per share, or 3.03%, from a closing price of $3.30 per share on August 10, 2022 to close at $3.20 per share on August 11, 2022.

24.     The truth fully emerged on November 16, 2022 when BurgerFi issued a press release announcing its financial results for the third quarter of 2022. The press release revealed, among other things, that the Company's revenue for the third quarter of 2022 was $43.3 million, which missed consensus estimates by $0.84 million. The Company explained that "[f]or the BurgerFi brand, same-store sales decreased 11% and 6% in corporate-owned and franchised locations, respectively."

25.     On this news, the Company's stock price fell $0.24 per share, or 10.57%, from a closing price of $2.27 per share on November 15, 2022, to close at $2.03 per share on November

16, 2022. Notably, this marked a ***$13.68 drop*** from the price per share of the Company's stock at the close of trading the day the Merger was completed (i.e., December 17, 2020), further indicating that OPES significantly overpaid for its acquisition of Legacy BurgerFi pursuant to the Merger. The Company is presently valued at approximately $38 million, and its market cap has decreased by nearly 45% over the last year alone.

26.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (i) BurgerFi misrepresented to its pre-Merger investors what its growth strategy would be once the Merger was completed; (ii) BurgerFi had overstated the effectiveness of its strategies for acquisition and growth; (iii) BurgerFi had misrepresented to investors the purported benefits of the Anthony's Acquisition and its post-Anthony's Acquisition business and financial prospects; and (iv) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

27.     The Individual Defendants further breached their fiduciary duties and engaged in other misconduct to the Company's detriment and/or aided and abetted the same by engaging in, allowing and/or facilitating the Overpayment Misconduct and related misconduct.

28.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

29.     In light of the Individual Defendants' misconduct, which has subjected the Company and various of the Individual Defendants to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

30.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

31.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of various of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the

- 11 -

Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

33.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

35.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiffs**

36.     Plaintiffs are current shareholders of BurgerFi. Plaintiffs have continuously held BurgerFi common stock since purchasing them on June 22, 2020.

**Nominal Defendant BurgerFi**

37.     Nominal Defendant BurgerFi is a Delaware corporation with its principal executive offices at 200 West Cypress Creek Road, Suite 220, Fort Lauderdale, Florida 33309. BurgerFi's common stock and redeemable warrants trade on the Nasdaq Stock Market ("NASDAQ") under ticker symbol "BFI" and "BFIIW", respectively. Before the Merger, the Company's units, common stock, and redeemable warrants traded on the NASDAQ under the ticker symbols "OPESU", "OPES", and "OPESW", respectively.

**Defendant Sternberg**

38.     Defendant Sternberg has served as the Executive Chairman of the Board since December 2020 and as a BurgerFi director since the Merger. Prior to the Merger, Defendant Sternberg served as OPES's CEO from June 2020 to October 15, 2020 and as one of its directors from October 2019 until the Merger. He also serves as a member of the Product & Innovation Committee. Defendant Sternberg had a controlling interest in the Sponsor, meaning he was entitled to significant payouts from the Trust Account upon the Company's completion of a qualifying merger. Defendant Sternberg was thereby interested in completing the Merger.

39.     According to the Schedule 14A the Company filed with the SEC on June 1, 2023 (the "2023 Proxy Statement"), as of May 15, 2023, Defendant Sternberg beneficially owned 4,734,068 shares of the Company's common stock, representing 18.9% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Sternberg owned approximately $5,964,926 worth of BurgerFi stock.

40.     For the fiscal year ended January 2, 2023 (the "2022 Fiscal Year"), Defendant Sternberg received $1,916,194 in total compensation from the Company. This included $1,902,765 in stock awards and $13,429 in all other compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Sternberg received $14,535,000 in total compensation from the Company, made up entirely of stock awards.

41.     The 2023 Proxy Statement stated the following about Defendant Sternberg:

**Ophir Sternberg** has been the Company's Executive Chairman of the Board since December 2020, having served as a member of our Board of Directors since October 2019, Chairman since April 2020, and Chief Executive Officer from June 2020 to December 2020. Mr. Sternberg has over 30 years of experience in investing across numerous industries and segments. Mr. Sternberg additionally serves on the Board of Directors for MSP Recovery, Inc. d/b/a LifeWallet (NASDAQ: LIFW)

and is Chairman of the Board for Security Matters Public Limited Company (NASDAQ: SMX). Mr. Sternberg is the Founder and Chief Executive Officer of Miami-based Lionheart Capital, LLC founded in 2009. We believe Mr. Sternberg is well qualified to serve on our board of directors due to his business experience, contacts and relationships, as well as his extensive experience in both the public and private company sectors.

**Defendant Ramirez**

42.     Defendant Ramirez served as CEO of BurgerFi from the Merger until November 8, 2021. Prior to this, Defendant Ramirez served as CEO of Legacy BurgerFi from October 16, 2020 until the Merger.

43.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Ramirez received $225,000 in total compensation from the Company, made up entirely of salary. For the 2020 Fiscal Year, Defendant Ramirez received $5,410,000 in total compensation from the Company. This included $55,000 in salary and $5,355,000 in stock awards.

44.     The Schedule 14A the Company filed with the SEC on July 21, 2021 (the "2021 Proxy Statement") stated the following about Defendant Ramirez:

**Julio Ramirez** has served as Chief Executive Officer of BurgerFi since December 2020 and continues to serve in that role within the Company. Mr. Ramirez has over 40 years of experience in the multi-unit restaurant industry. Mr. Ramirez founded JEM Global, Inc. ("JEM"), a company specializing in assisting QSR and fast casual brands with franchising and development efforts domestically and internationally. Through JEM, he consulted Dunkin Brands on its Brazil entry strategy and Buffalo Wings and Rings on its Mexico development strategy. He was also co-owner of Giardino Gourmet Salads, South Florida's fast-casual concept focused on garden-to-bowl nutrition, helping to grow the brand in Miami, Fort Lauderdale and Naples, Florida. Prior to JEM, Mr. Ramirez was with Burger King Corporation for over 25 years. In his tenure at Burger King, Mr. Ramirez held several key senior executive roles. These roles included Senior Vice President of North America Franchise Operations & Development, and twice the President of the Latin American region, where he had teams that opened Burger King franchises in over 10 countries, including Brazil, Colombia, and many others. Additionally, he was the Executive Vice President of Global Operations. In this role he effectively managed the supply chain, selecting outstanding franchisees, directed the operations team and

developed food safety and training programs. Mr. Ramirez holds an MBA from the University of Georgia. He has also completed the Advanced Management Program from The Wharton School at the University of Pennsylvania. He served as an Executive Board Member of the United Way of Miami-Dade County, was a founding member of the Burger King "Have it Your Way" Foundation and is currently a member of the prestigious Orange Bowl Committee. Mr. Ramirez was an external director at Grupo Intur—the largest franchisee of American QSR brands in Central America with over 200 locations of 8 different brands across several nations.

**Defendant Baines**

45.     Defendant Baines served as the Company's CEO from November 8, 2021 until he resigned effective June 7, 2023. According to the 2023 Proxy Statement, as of May 15, 2023, Defendant Baines beneficially owned 126,997 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Baines owned approximately $160,016 worth of BurgerFi stock.

46.     For the 2022 Fiscal Year, Defendant Baines received $534,188 in total compensation from the Company. This included $523,628 in salary and $10,560 in all other compensation. For the 2021 Fiscal Year, Defendant Baines received $721,000 in total compensation from the Company. This included $543,000 in salary and $178,000 in bonuses.

47.     The 2023 Proxy Statement stated the following about Defendant Baines:

**Ian Baines** has served as our Chief Executive Officer since November 2021. On May 8, 2023, Mr. Baines notified the Company that he is retiring and resigning from his positions with the Company effective June 7, 2023. Mr. Baines served as the President and Chief Executive Officer of ACFP Management, Inc. from January 2020 until November 2021. Mr. Baines has over four decades of experience in the restaurant and hospitality business, beginning as a classically trained chef in his native England, followed by 25 years in Canada with ever increasing roles and responsibilities culminating into Chief Operating Officer of SIR Corp restaurants. In 2004, Mr. Baines was actively recruited to join Brinker International, Inc. where he served in various executive roles. He joined Darden Restaurants Inc. and led the Smokey Bones brand as President before the sale to Sun Capital Partners, Inc., where he continued for several years as President and

Chief Executive Officer. He was recruited back to Brinker International, Inc. in 2011 as Senior Vice President of Strategic Innovation. From 2013 to 2014, Mr. Baines served as President and Chief Executive Officer of Uno Restaurant Holdings Corporation. From 2014 to 2018, he served as President and Chief Executive Officer of Cheddar's Scratch Kitchen (*"Cheddar's"*); after the sale of Cheddar's to Darden Restaurants Inc. in 2017 he continued as Brand President. In 2019, he was Chief Executive Officer of Del Frisco's Restaurant Group, Inc. during the transition from a public company to three independent brands and ultimately the sale of the steak division. Except for the Amended and Restated Stock Purchase Agreement dated November 3, 2021 (as subsequently amended) by and among the Company, Cardboard, and Hot Air, Inc., a Delaware corporation (*"Hot Air"*), pursuant to which the Anthony's acquisition was consummated., there are no arrangements or understandings between Mr. Baines and any other person pursuant to which he was appointed.

**Defendant McGuire**

48.     Defendant McGuire served as the Company's Chief Financial Officer ("CFO") from the Merger until March 31, 2021. Prior to this, Defendant McGuire served as CFO of Legacy BurgerFi from May 2020 until the Merger.

49.     For the 2020 Fiscal Year, Defendant McGuire received $105,505 in total compensation from the Company, made up entirely of salary.

50.     The Merger Proxy Statement stated the following about Defendant McGuire:

**Bryan McGuire** serves as the Chief Financial Officer of BurgerFi and will continue to serve in that role in the Post-Combination Company. He has over 25 years of experience in executive finance, specializing in growing restaurant companies. From 2006 to 2020, Mr. McGuire was a founder and partner in Quantum Peak Consulting LLC ("QPC"). QPC is a boutique business consulting firm based in Tampa, FL specializing in business planning for high growth multi-unit restaurant companies and SEC reporting for public entities. From 2000 to 2006, Mr. McGuire was the Chief Financial Officer for Ker's WingHouse where revenue grew from $12,000,000 to $50,000,000. From 1997 to 2000, he was Vice President of Finance & IT for Hops Restaurant Bar & Brewery, an 80-unit chain based in Tampa, FL. Prior to that, he was Controller with Cucina! Cucina! based in Seattle, a high-growth, multi-unit Italian restaurant chain. From 1991 to 1995, he was with Checker's Drive-in Restaurants. Experience at Checkers included an IPO, a secondary public offering, all SEC compliance and reporting, and growth from 103 restaurants to over 550. Mr. McGuire began his career in 1987 in public accounting

with Concannon Miller & Company and Cherry Bekaert & Holland, CPA's. Mr. McGuire earned his B.S. in Accounting from the Fisher School of Accounting at the University of Florida, and his CPA in Florida in June 1990.

**Defendant Rabinovitch**

51.     Defendant Rabinovitch has served as the Company's CFO since April 1, 2021. According to the 2023 Proxy Statement, as of May 15, 2023, Defendant Rabinovitch beneficially owned 472,866 shares of the Company's common stock, representing 2.0% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Rabinovitch owned approximately $595,811 worth of BurgerFi stock.

52.     For the 2022 Fiscal Year, Defendant Rabinovitch received $1,582,970 in total compensation from the Company. This included $400,000 in salary, $1,093,077 in stock awards, and $89,901 in all other compensation. For the 2021 Fiscal Year, Defendant Rabinovitch received $3,760,000 in total compensation from the Company. This included $215,000 in salary, $250,000 in bonuses, and $3,295,000 in stock awards.

53.     The 2023 Proxy Statement stated the following about Defendant Rabinovitch:

**Michael Rabinovitch** joined the Company on February 26, 2021 and assumed the position of Chief Financial Officer on May 3, 2021. Mr. Rabinovitch served as Senior Vice President and Chief Accounting Officer of Tech Data Corporation from March 2018 until September 2020. Prior thereto, Mr. Rabinovitch was employed at Office Depot, where he served as Vice President of Finance, North America from January 2015 to March 2017 and Senior Vice President, Finance and Chief Accounting Officer from March 2017 to February 2018. From 2005 through 2015, he served as Executive Vice President and Chief Financial Officer of Birks Group (a/k/a Mayors Jewelers), a North American manufacturer and retailer of fine jewelry and luxury timepieces. Prior to joining Birks Group, Mr. Rabinovitch was Vice President of Finance of Claire's Stores, Inc., a specialty retailer of fashion jewelry and accessories, from 1999 to 2005. Mr. Rabinovitch began his career as an auditor with Price Waterhouse LLP. Mr. Rabinovitch is a licensed certified

public accountant (inactive) and a member of the American Institute of Certified Public Accountants.

**Defendant Greenfield**

54.     Defendant Greenfield has served as a Company director since the Merger. Prior to the Merger, Defendant Greenfield served as a director of OPES from August 2020 until the Merger. She also serves as Chair of the Compensation Committee and Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of May 15, 2023, Defendant Greenfield beneficially owned 48,518 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Greenfield owned approximately $61,133 worth of BurgerFi stock.

55.     For her service as a director for the 2022 Fiscal Year, Defendant Greenfield received at least $103,175[3] worth of stock awards and was "entitled to receive annual cash compensation of $50,000, payable on or before December 31, 2023, subject to such director's continuous service as a director until such time" in total compensation from the Company. For her service as a director for the 2021 Fiscal Year, Defendant Greenfield received at least $218,908[4]

---

[3] According to the 2023 Proxy Statement, for the 2022 Fiscal Year, each independent director was granted restricted stock units in an amount equal to $100,000 divided by the closing price on the last trading day of the calendar year (or $1.26 per share, based on the closing price of the Company's common stock on December 30, 2022), generally to vest on the one-year anniversary of the date of grant and to be settled in shares of common stock, subject to such director's continuous service as a director until such time and earlier vesting due to a change of control. The grant date fair value per share of the stock awards Company directors received pursuant to the Plan during the 2022 Fiscal Year was $1.30 (i.e., the price per share of the Company's stock at the close of trading on January 3, 2023, the day the directors were granted the awards).

[4] According to the 2022 Proxy Statement, for the 2021 Fiscal Year, each independent director was

worth of stock awards and $7,500 in annual cash compensation, which amounts made up her total

compensation received from the Company for the 2021 Fiscal Year.

56.     The 2023 Proxy Statement stated the following about Defendant Greenfield:

**Allison Greenfield** has served as a member of the Company's Board of Directors since June 2020. Ms. Greenfield has over two decades of experience in real estate development. Ms. Greenfield is the Chief Development Officer and has been a partner of Lionheart Capital, LLC, since it was founded in 2009 and has over 25 years of experience in the entitlement, design, construction and management of projects in all segments of the real estate industry, including industrial, retail, hospitality, and ultra-luxury residential condominiums. At Lionheart Capital, LLC, she has been responsible for the successful acquisition, development, and repositioning of real estate assets around the world. Prior to her tenure at Lionheart Capital, LLC, Ms. Greenfield ran the development and construction arm of Oz Holdings, LLC as a partner from 2001-2010. Ms. Greenfield studied Architecture at The New School University, Parsons School of Design and holds a B.A. in History from Barnard College/Columbia University. We believe Ms. Greenfield is well-qualified to serve on our Board of Directors due to her business experience, contacts and relationships.

**Defendant Stewart**

57.     Defendant Stewart has served as a Company director since February 2021. She also

serves as Chair of the Product & Innovation Committee. According to the 2023 Proxy Statement,

as of May 15, 2023, Defendant Stewart beneficially owned 26,942 shares of the Company's

common stock. Given that the price per share of the Company's common stock at the close of

---

granted restricted stock units in an amount equal to $150,000 divided by the closing price on the last trading day of the fiscal year (or $5.67 per share, based on the closing price of the Company's common stock on December 31, 2021), generally to vest on the one-year anniversary of the date of grant and to be settled in shares of common stock, subject to such director's continuous service as a director until such time and earlier vesting due to a change of control. The grant date fair value per share of the stock awards Company directors received pursuant to the Plan during the 2021 Fiscal Year was $6.26 (i.e., the price per share of the Company's stock at the close of trading on January 3, 2022, the day the directors were granted the awards). Awards of 5,000 restricted stock units were also granted to each of Defendants Stewart, Greenfield, and Mann under the Plan on July 13, 2021, when the Company's stock closed at a price of $10.66 per share. For the 2021 Fiscal Year, each independent director also received annual cash compensation of $7,500.

trading on May 15, 2023 was $1.26, Defendant Stewart owned approximately $33,947 worth of BurgerFi stock.

58.     For her service as a director for the 2022 Fiscal Year, Defendant Stewart received at least $103,175 worth of stock awards and was "entitled to receive annual cash compensation of $50,000, payable on or before December 31, 2023, subject to such director's continuous service as a director until such time" in total compensation from the Company. For her service as a director for the 2021 Fiscal Year, Defendant Stewart received at least $218,908 worth of stock awards and $7,500 in annual cash compensation, which amounts made up her total compensation received from the Company for the 2021 Fiscal Year.

59.     The 2023 Proxy Statement stated the following about Defendant Stewart:

**Martha Stewart** has served as a member of the Company's Board of Directors since February 2021. Ms. Stewart is a businesswoman, writer, and television personality. As founder of Martha Stewart Living Omnimedia, *"MSLO,"* she gained success through a variety of business ventures, encompassing publishing, broadcasting, merchandising and e-commerce. She has written numerous bestselling books, is the publisher of Martha Stewart Living magazine and hosted two syndicated television programs: Martha Stewart Living, which ran from 1993 to 2004, and Martha, which ran from 2005 to 2012. Ms. Stewart currently serves as the Chief Creative Officer of Marquee Brands, a position she has held since June 2019. Prior to that, Ms. Stewart served as Chief Creative Officer of Sequential Brands Group, Inc. from December 2015 to June 2019. Ms. Stewart has served on the board of directors of the Sequential Brands Group, Inc. since December 2015. Ms. Stewart has also served on the board of AppHarvest, Inc. since May 2020. Ms. Stewart was Founder, Chief Creative Officer and Non-Executive Chairman of the board of directors of MSLO from 1996 through June 2003. She also served as Chief Executive Officer from 1996 through June 2003. Ms. Stewart earned a bachelor's degree in European history and architectural history from Barnard College. We believe Ms. Stewart is well qualified to serve on the Company's Board of Directors due to her business experience, extensive contacts and relationships.

**Defendant Mann**

60.     Defendant Mann has served as a Company director since the Merger. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of May 15, 2023, Defendant Mann beneficially owned 28,518 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Mann owned approximately $35,933 worth of BurgerFi stock.

61.     For his service as a director for the 2022 Fiscal Year, Defendant Mann received at least $103,175 worth of stock awards and was "entitled to receive annual cash compensation of $50,000, payable on or before December 31, 2023, subject to such director's continuous service as a director until such time" in total compensation from the Company. For his service as a director for the 2021 Fiscal Year, Defendant Mann received at least $218,908 worth of stock awards and $7,500 in annual cash compensation, which amounts made up his total compensation received from the Company for the 2021 Fiscal Year.

62.     The 2023 Proxy Statement stated the following about Defendant Mann:

**Gregory Mann** has served as a member of the Company's Board of Directors since December 2020. Mr. Mann has over 20 years of experience in delivering outstanding results for leading U.S. and global companies. Mr. Mann previously served as Chief Marketing Officer for Trustly, Inc. He has also previously served at Hydrus Technology as a Board member and in a variety of advising, consulting, leadership, and managerial roles where he developed the firm's commercialization and go to market (GTM) strategy that led to the company's first long-term commercial contract. Prior to Hydrus, from March 2017 to November 2018, Mr. Mann created a stand-alone P&L division at Catalina Marketing as President of Emerging Brands where he architected and implemented a new three-year business strategy that included the launch of new data and marketing services which significantly increased new client deal size and improved client retention. Mr. Mann also developed and drove the vision and general management for the newly founded Emerging Brands division focused on thousands of consumer-

packaged goods companies. Prior to Catalina, Mr. Mann worked as the Chief Marketing Officer for LoopPay, where he was part of the founding team which was then acquired by Samsung in order to develop and launch Samsung Pay. Mr. Mann holds an MBA from The Wharton School and a Master's Degree in International Studies from the University of Pennsylvania's Lauder Institute. We believe that Mr. Mann's experience as an entrepreneurial executive and corporate innovator that has built and led established startup, turnaround, and hyper-growth companies and divisions globally will continue to be a valuable asset to the Company's Board of Directors.

**Defendant Lopez-Blanco**

63.     Defendant Lopez-Blanco has served as a Company director since July 2021. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of May 15, 2023, Defendant Lopez-Blanco beneficially owned 28,518 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 15, 2023 was $1.26, Defendant Lopez-Blanco owned approximately $35,933 worth of BurgerFi stock.

64.     For her service as a director for the 2022 Fiscal Year, Defendant Lopez-Blanco received at least $103,175 worth of stock awards and was "entitled to receive annual cash compensation of $50,000, payable on or before December 31, 2023, subject to such director's continuous service as a director until such time" in total compensation from the Company. For her service as a director for the 2021 Fiscal Year, Defendant Lopez-Blanco received at least $165,608 worth of stock awards and $7,500 in annual cash compensation, which amounts made up her total compensation received from the Company for the 2021 Fiscal Year.

65.     The 2023 Proxy Statement stated the following about Defendant Lopez-Blanco:

**Vivian Lopez-Blanco** has served as a member of the Company's Board of Directors since July 2021. Ms. Lopez- Blanco also serves on the board of Jumptuit

Health, Inc. Prior to joining the Company, Ms. Lopez-Blanco served as an advisory board member of BBVA, South Florida operations, from 2019 until June 2021, Chief Financial Officer of Mednax, Inc. (NYSE: MD) from 2010 until 2018, Vice President and Treasurer of Mednax, Inc. from 2008 to 2010 and Chief Financial Officer of Carrols Corporation's Hispanic Restaurants Division, which includes the Pollo Tropical and Taco Cabana concepts, from 2003 to 2008. Ms. Lopez-Blanco joined Pollo Tropical in 1997 as Controller and was promoted to Chief Financial Officer in 1998 and led the company through its acquisition by Carrols Corporation, developed and realigned key business processes and implemented several financial systems. Earlier in her career, Ms. Lopez-Blanco spent years in an international accounting firm where she progressed through different management roles and gained extensive experience in public company reporting and capital market expansions. Ms. Lopez-Blanco earned a bachelor's degree in accounting from Florida International University and is a certified public accountant. We believe Ms. Lopez-Blanco is well qualified to serve on our Board of Directors due to her business experience, including her experience in public accounting and as the Chief Financial Officer of public companies, her contacts and relationships.

**Defendant Taub**

66.     Defendant Taub has served as a Company director since November 2021.

67.     For his service as a director for the 2022 Fiscal Year, Defendant Taub was "entitled to receive annual cash compensation of $50,000, payable on or before December 31, 2023, subject to such director's continuous service as a director until such time" in total compensation from the Company. For his service as a director for the 2021 Fiscal Year, Defendant Taub received $7,500 in annual cash compensation, which amounts made up his total compensation received from the Company for the 2021 Fiscal Year.

68.     The 2023 Proxy Statement stated the following about Defendant Taub:

**Andrew Taub** has served as a member of the Company's Board of Directors since November 2021. Mr. Taub has been a Managing Partner of L Catterton, where he focuses on the Flagship Buyout Fund, since 1996. L Catterton is the world's largest consumer-focused private equity firm, with approximately $30 billion of equity capital across six fund strategies in 17 offices globally and has advised certain funds affiliated with the entity that sold Anthony's to the Company and has provided advisory services to subsidiaries of the Company. Mr. Taub's investment and operating expertise spans the consumer and healthcare services landscape through

investments in the pet, optical, restaurant, food and marketing services industries. In addition to serving on the Company's Board of Directors, Mr. Taub currently serves as a director of several L Catterton portfolio companies, including JustFoodForDogs, PatientPoint Health Technologies, and FYidoctors. Mr. Taub holds a Bachelor of Arts degree in Finance and Accounting from the University of Michigan at Ann Arbor and a Master of Business Administration degree from Columbia Business School. We believe Mr. Taub is qualified to serve on our Board of Directors due to his extensive business experience. Mr. Taub serves as a director pursuant to CP7's right under the A&R CoD regarding the Company's Series A Junior Preferred Stock, whereby, for so long as CP7, its affiliates or certain related persons of CP7, directly or indirectly, hold collectively 70% or more of the shares of the Series A Junior Preferred Stock issued as of the date of the A&R CoD, CP7 shall have the option and the right (but not the obligation) to designate two directors.

**Defendant Cordova Vera**

69.     Defendant Cordova Vera served as an OPES director from October 2019 until the Merger. Defendant Cordova Vera is one of the Initial Stockholders who held 1,265,000 Founders' Shares, thereby rendering him interested in completing the Merger.

70.     The Merger Proxy Statement stated the following about Defendant Cordova Vera:

**José Luis Córdova Vera** has served as our Chief Financial Officer since October 2019. Mr. Cordova has been a private consultant since October 2019. From 2017 to September 2019, he served as Vice President of Strategic Planning & Finance at Oro Negro, a Mexican oilfield services company. From 2012 to 2015, Mr. Cordova worked for Deloitte as Vice President of Corporate Finance. He has also held roles in investment risk management for large financial institutions. Mr. Cordova is an Industrial Engineer from Pontificia Universidad Catolica del Peru, received an M.B.A. from Cornell University, and is a CFA and CAIA Charterholder.

**Defendant Brain**

71.     Defendant Brain served as an OPES director from April 2020 until the Merger.

72.     The Merger Proxy Statement stated the following about Defendant Brain:

**David Brain** served as Chief Executive Officer of the Company from April 2020 until June 2020. Mr. Brain has served as CEO of Enfinite Capital, LLC since 2017, an investment and development firm which he co-founded in late 2017. The firm is focused on renewable energy and infrastructure projects and has an alliance with

Black & Veatch. Mr. Brain served as the President and Chief Executive Officer as well as a Board Member/Trustee of Entertainment Properties Trust/EPR Properties, an NYSE traded real estate investment trust (NYSE:EPR) for over 15 years until stepping down in 2015. Mr. Brain co-founded the Company in 1997 and served as its original CFO. He was named CEO in September of 1999. Mr. Brain currently serves on the Board of Maxus Properties, (MRTI), a public externally managed multi-family residential REIT, Alamo Drafthouse Theatres and Plexpod, a midwestern coworking property developer and operator. He received a Bachelor of Arts degree in Economics with honors from Tulane University, where he was also named Phi Beta Kappa and an MBA from the A. B. Freeman Graduate Business School at Tulane University.

**Defendant Anderson**

73.     Defendant Anderson served as an OPES director from April 2020 until the Merger.

74.     The Merger Proxy Statement stated the following about Defendant Anderson:

**James Anderson** has over 40 years of entrepreneurial business experience with a major focus in real estate and business development including internationally. He has either been a sole founder or founding partner in several commercial ventures. He has been an owner/broker of JA Real Estate Partners, LLC (New York, NY) since 2001. He co-founded Iowa State Commercial Investment Company, LLC in 2017; he acted as Senior Advisor to F&T Group from 2008-2014 in connection with the Nanjing World Trade Center mixed-use development project; and he was a regional manager/vice president of DeWolfe Companies, Inc. from 1989-1996. Mr. Anderson resided in China for nearly 10 years (2008-2017) where he was involved in numerous business/real estate development projects. He holds a BBA degree from the University of Iowa.

**Defendant Byorum**

75.     Defendant Byorum served as an OPES director from January 2018 until the Merger.

76.     The Merger Proxy Statement stated the following about Defendant Byorum:

***Martha (Stormy) L. Byorum*** has served as a member of our board of directors since January 2018. Ms. Byorum is founder and chief executive officer of Cori Investment Advisors, LLC (Cori Capital), a financial services entity that was most recently (January 2005 through August 2013) a division of Stephens Inc., a private investment banking firm founded in 1933. She has also been a managing director at Young America Capital LLC, since October 2014. Ms. Byorum is a Life Trustee of Amherst College. She has also  served as a director of Tecnoglass Inc. (formerly Andina Acquisition Corp., or "Andina") since 2011, where she currently serves as

- 25 -

chair of the audit committee, as a director of Northwest Natural Gas Company since 2004, where she currently serves as chair of the finance committee and as a member of the audit and governances committees, and as a director of JELD-WEN Holding, Inc. since 2014, where she currently is a member of the audit and governance and nominating committees. Ms. Byorum received a B.B.A. from Southern Methodist University and an M.B.A. from The Wharton School at the University of Pennsylvania.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

77.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

78.    Each director and/or officer of the Company owes to BurgerFi and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

79.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

80.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

81.     Each Individual Defendant at OPES leading up to the Merger, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of those Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by certain of the Individual Defendants who collectively comprised the Company's Board at all relevant times.

82.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at OPES had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

- 27 -

83. To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to BurgerFi's own Code of Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

84.      Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

85.      At all times relevant hereto, the Individual Defendants at OPES were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

86.      Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

87.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

88.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

89.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

90.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of OPES's board of directors and Legacy BurgerFi's board of directors, each of the Individual Defendants who was a director of OPES or Legacy BurgerFi was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

91.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

92.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company or Legacy BurgerFi and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

93.     Pursuant to the Company's Code of Ethics, the conduct of "all directors, officers, and employees of the Company" is governed by the Code of Ethics.

94.     According to the Code of Ethics, its purpose is to:

• promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• promote the full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company;

• promote compliance with applicable governmental laws, rules, and regulations;

• deter wrongdoing; and

• require prompt internal reporting of breaches of, and accountability for adherence to, this Code

95.     Regarding "Honest, Ethical and Fair Conduct," the Code of Ethics provides the following, in relevant part:

Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair, and candid. Deceit, dishonesty, and subordination of the Company's interests to personal interests are inconsistent with integrity. Service to the Company should never be subordinated to personal gain and advantage.

Each person must:

• Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests.

• Observe all applicable governmental laws, rules, and regulations. • Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data.

• Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

• Deal fairly with the Company's customers, suppliers, competitors, and employees.

• Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

• Protect the assets of the Company and ensure their proper use.

• Refrain from taking for themselves personally opportunities that are discovered through the use of corporate assets and refrain from using corporate assets, information, or position for general personal gain outside the scope of employment with the Company.

96.     Regarding conflicts of interest, the Code of Ethics provides the following:

• [Each person must] [a]void conflicts of interest, wherever possible, except under guidelines or resolutions approved by the Board of Directors (or the appropriate committee of the Board). Anything that would be a conflict for a person subject to this Code also will be a conflict if it is related to a member of his or her family or a close relative. Examples of conflict of interest situations include, but are not limited to, the following:

        • any significant ownership interest in any supplier or customer;

• any consulting or employment relationship with any customer, supplier, or competitor;

• any outside business activity that detracts from an individual's ability to devote appropriate time and attention to his or her responsibilities with the Company;

• the receipt of any money, non-nominal gifts, or excessive entertainment from any company with which the Company has current or prospective business dealings;

• being in the position of supervising, reviewing, or having any influence on the job evaluation, pay, or benefit of any close relative;

• selling anything to the Company or buying anything from the Company, except on the same terms and conditions as comparable officers or directors are permitted to so purchase or sell; and

• any other circumstance, event, relationship, or situation in which the personal interest of a person subject to this Code interferes – or even appears to interfere – with the interests of the Company as a whole.

97.     In a section titled "Compliance," the Code of Ethics provides:

It is the Company's obligation and policy to comply with all applicable governmental laws, rules, and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules, and regulations, including those relating to accounting and auditing matters.

98.     In a section titled "Disclosure," the Code of Ethics states the following:

The Company strives to ensure that the contents of and the disclosures in public communications and in the reports and documents that the Company files with the SEC shall be full, fair, accurate, timely, and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

• not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators, self-regulating organizations, and other governmental officials, as appropriate; and

- 33 -

> • in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.
>
> ***
>
> Each person must promptly bring to the attention of the Chairman of the Audit Committee of the Company's Board of Directors (or the Chairman of the Company's Board of Directors if no Audit Committee exists) any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls which could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

99.     In a section titled "Reporting and Accountability," the Code of Ethics states the following:

> The Board of Directors or Audit Committee, if one exists, of the Company is responsible for applying this Code to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation. Any person who becomes aware of any existing or potential breach of this Code is required to notify the Chairman of the Board of Directors or Audit Committee promptly. Failure to do so is itself a breach of this Code.
>
> Specifically, each person must:
>
> > • Notify the Chairman promptly of any existing or potential violation of this Code.
> >
> > • Not retaliate against any other person for reports of potential violations that are made in good faith.
>
> The Company will follow the following procedures in investigating and enforcing this Code and in reporting on the Code:
>
> > • The Board of Directors or Audit Committee, if one exists, will take all appropriate action to investigate any breaches reported to it.
> >
> > • If the Audit Committee (if one exists) determines by majority decision that a breach has occurred, it will inform the Board of Directors.
> >
> > • Upon being notified that a breach has occurred, the Board by majority decision will take or authorize such disciplinary or preventive action as it

- 34 -

deems appropriate, after consultation with the Audit Committee (if one exists) and/or the Company's counsel, up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities.

100.    Regarding "Waivers and Amendments," the Code of Ethics provides:

Any waiver (defined below) or an implicit waiver (defined below) from a provision of this Code for the principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions or any amendment (as defined below) to this Code is required to be disclosed in the Company's Annual Report on Form 10-K or in a Current Report on Form 8-K filed with the SEC.

A "waiver" means the approval by the Company's Board of Directors of a material departure from a provision of the Code. An "implicit waiver" means the Company's failure to take action within a reasonable period of time regarding a material departure from a provision of the Code that has been made known to an executive officer of the Company.

An "amendment" means any amendment to this Code other than minor technical, administrative, or other non-substantive amendments hereto.

All persons should note that it is not the Company's intention to grant or to permit waivers from the requirements of this Code. The Company expects full compliance with this Code.

101.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## BURGERFI'S AUDIT COMMITTEE CHARTER

102.    The Company also maintains an Audit Committee Charter (the "Charter"). Regarding the Company's annual Forms 10-K, the Charter states that the Audit Committee shall "[r]eview and discuss with management and the independent auditor the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K []." Similarly, regarding the Company's quarterly Forms 10-Q, the Charter states that the Audit Committee shall "[r]eview and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements."

103.    The Charter states that the Audit Committee shall "[d]iscuss with management the Company's earnings press releases generally, including the use of 'pro forma' or 'adjusted' non-GAAP information, and any financial information and earnings guidance provided to analysts and rating agencies."

104.    Regarding risks, the Charter stated that the Audit Committee shall "[d]iscuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies."

105.    Finally, with respect to the Company's internal control over financial reporting and disclosure controls and procedures, the Charter states that the Audit Committee shall:

> Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer (or individuals performing similar functions) during their certification process for the Form 10-K and Form 10-Qs about any significant deficiencies and material weaknesses in the design or

operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

106.     In violation of the Charter, Defendants Lopez-Blanco, Greenfield, and Mann failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

107.     BurgerFi purports to be "a multi-brand restaurant company that develops, markets and acquires fast-casual and premium-casual dining restaurant concepts around the world, including corporate-owned stores and franchises located in the United States, Puerto Rico and Saudi Arabia." BurgerFi had 172 franchised and corporate-owned restaurants as of April 3, 2023.

108.     The Company is the result of the Merger between OPES and Legacy BurgerFi, a private Delaware company that was purportedly "one of the nation's fastest-growing better burger concepts."

### *History of OPES*

109.     OPES was incorporated on July 23, 2017 and operated as a SPAC, a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public.

110.     In November 2017, the Company issued an aggregate of 2,875,000 Founder Shares to Axis Public Ventures, an affiliate of the Sponsor, for an aggregate purchase price of $25,000.

111.     On March 9, 2018, Axis Public Ventures transferred 2,012,500 Founder Shares to the Initial Stockholders for the same price originally paid for such shares. The Founder Shares included an aggregate of up to 375,000 shares subject to forfeiture by the Initial Stockholders to the extent that the underwriters' over-allotment was not exercised in full or in part, so that the Initial Stockholders would own 20% of the Company's issued and outstanding shares after the IPO. As the Founder Shares did not entitle the Individual Defendants to redemption rights, the Founder Shares would have expired worthless if OPES failed to timely complete a business combination.

112.     On March 16, 2018, the Company consummated its IPO, selling 10,000,000 units of its common stock and generating gross proceeds of $100,000,000.[5] Simultaneously with the closing of the IPO, the Company sold 400,000 Private Placement Units at a price of $10.00 per unit in a private placement to Axis Public Ventures, Lion Point, and the Initial Stockholders, generating gross proceeds of $4,000,000. Like the Founder Shares, because the Private Placement Units did not entitle the Individual Defendants to redemption rights, the Private Placement Units would have expired worthless if OPES failed to timely complete a business combination.

113.     On March 20, 2018, the Company consummated the sale of an additional 45,000 Private Placement Units at a price of $10.00 per Private Placement Unit, which were purchased by the Sponsor, generating gross proceeds of $450,000. Each Private Placement Unit consisted of one share of common stock and one warrant to purchase one share of common stock at an exercise

---

[5] https://ir.burgerfi.com/sec-filings/all-sec-filings/content/0001213900-20-040068/ea130561-defm14a_opesacqu.htm#pre_013

price of $11.50. The same day, as a result of the underwriters' election to exercise their over-allotment option in full, 375,000 Founder's Shares were no longer subject to forfeiture.

114.     The proceeds from the sale of the Private Placement Units were added to the proceeds from the IPO, for total proceeds of $101,000,000, and placed in the Trust Account. The Private Placement Units would have expired worthless if OPES failed to timely complete a business combination.

115.     As each of the Individual Defendants at OPES at the time had either a direct or indirect economic interest in the Founder Shares and/or Private Placement Units, they stood to profit significantly from the Merger.

116.     The Individual Defendants' profits were not guaranteed, however, as the Individual Defendants' ability to profit off their investments was subject to certain restrictions in OPES's Certificate of Incorporation and/or for those at Legacy BurgerFi or the post-Merger Company, profits were contingent on the Overpayment Misconduct and concurrent Merger.

117.     According to OPES's Certificate of Incorporation, OPES had only 18 months from the date of the IPO's closing to complete a business combination, the failure of which would have resulted in OPES: (1) ceasing all of its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeeming public shares; and (3) dissolving and liquidating the funds held in the Trust Account to return to OPES's investors. Because each of OPES's officers and directors agreed to waive their rights to liquidating distributions from the Trust Account, the Founder Shares and Private Placement Units would have expired worthless in the event OPES failed to timely complete a business combination.

118.   In an effort to give themselves more time to complete the qualifying business combination and avoid losing out on the windfalls they would receive therefrom, between September 2019 and March 2020, the OPES Defendants solicited shareholder approval for four amendments to the Company's Certificate of Incorporation to extend the time limit for the Company to complete a merger.

119.   Accordingly, by the time merger discussions between OPES and Legacy BurgerFi began on March 18, 2020, the Individual Defendants at OPES were under immense financial and time pressure to meet OPES's deadline to complete a business combination.

### *Background of Legacy BurgerFi*

120.   Legacy BurgerFi was founded in February 2011 by John Rosatti ("Rosatti") in Lauderdale-by-the-Sea, Florida as a private company. According to the Merger Proxy Statement, Legacy BurgerFi was established for the purpose of "redefining the way the world eats burgers by providing an upscale burger offering, at a fast-casual price point." Upon its inception, Legacy BurgerFi grew steadily, operating approximately 119 restaurants in 3 counties and 23 states as of September 30, 2020. Prior to the Merger, Legacy BurgerFi's management team consisted of Defendant Ramirez (CEO); Defendant McGuire (CFO); Charlie Guzzetta (President); Nick Raucci (Chief Operating Officer); Ross Goldstein (Chief Legal Officer); and Chef Paul Griffin (Chief Culinary Officer), all of whom continued to maintain these positions at the Company following the completion of the Merger.

### **The Merger and Overpayment Misconduct**

121.   On June 30, 2020, the Company announced that it had entered into the Merger Agreement with Legacy BurgerFi. Merging with OPES would allow Legacy BurgerFi to receive

funding to support its growth and bring Legacy BurgerFi public, thereby allowing it to access more types of capital in the future.[6] Indeed, regarding Legacy BurgerFi's plan to merge with OPES, Rosatti stated that the partnership would "enable us to further strengthen the BurgerFi brand and accelerate our growth as we continue to expand and bring the best burgers to even more customers around the world."[7]

122.     On December 17, 2020, the Merger closed. Pursuant to the terms of the Merger, the Company purchased 100% of the membership interests of Legacy BurgerFi, which resulted in Legacy BurgerFi becoming a wholly-owned subsidiary of the Company. The consideration paid by OPES in the Merger was approximately $100 million, calculated as follows: (i) $30,000,000 in cash payable to certain members of Legacy BurgerFi; (ii) $20,000,000 payable either in cash or in 1,886,792 shares of Common Stock based upon a pre-determined price of $10.60 per share, in the sole and absolute discretion of the OPES board of directors; and (iii) 4,716,981 shares of OPES Common Stock to be issued to certain members of Legacy BurgerFi. Upon completion of the Merger, the Company changed its name to BurgerFi International, Inc. and continued to own and operate fast-casual and premium-casual restaurants throughout the country. The post-Merger Company would purportedly be worth $143 million.[8]

123.     Leading up to the Merger, the OPES Defendants touted to investors that they had "careful[ly] consider[ed]" the proposed Merger and found that the transactions solicited in the Merger Proxy Statement were "advisable, fair to, and in the best interests of, OPES and its

---

[6] https://www.restaurantbusinessonline.com/financing/burgerfi-go-public-after-proposed-merger-opes-acquisition-corp. Last visited August 28, 2023.
[7] *Id.*
[8]     https://www.restaurantbusinessonline.com/financing/opes-acquisition-paying-100m-burgerfi. Last visited August 28, 2023.

stockholders." In reality, the OPES Defendants failed to conduct due diligence of Legacy BurgerFi prior to the Merger and, as a result, failed to discover that the growth of the post-Merger Company would be largely reliant on M&A activity, which would be high risk for BurgerFi.

124.    As a result of the material misrepresentations and omissions made by the Individual Defendants prior to and leading up to the close of the Merger (discussed in further detail below), Company shareholders were deceived into approving the unfavorable Merger instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of the Legacy BurgerFi (collectively, the "Overpayment Misconduct"). The Overpayment Misconduct is further illustrated by the fact that, by the end of the Relevant Period, the Company's common stock was trading at $2.03 per share, marking a **$13.68 drop** from the price per share of the Company's stock at the close of trading the day the Merger was completed (i.e., December 17, 2020). Moreover, the Company is presently valued at $38 million, having lost nearly 45% of its market capitalization in one year alone.

### <u>False and Misleading Statements Issued During the Relevant Period</u>

#### *June 30, 2020 Proxy Materials*

125.    The Relevant Period begins on June 30, 2020 when the Company announced that it had entered into the Merger Agreement with Legacy BurgerFi and filed various proxy materials with the SEC. One of the proxy materials, a Form 8-K attaching a press release, stated the following, in relevant part:

> "BurgerFi's position within the rapidly expanding *'better-burger' space* combined with its technology-driven business model and highly-scalable structure makes it poised for significant shareholder value creation," said Ophir Sternberg, Chairman & CEO of OPES. "***We believe that BurgerFi is positioned for rapid growth. Our team is thrilled to partner with BurgerFi's senior management to support the numerous growth initiatives underway and to drive operational excellence***."

Attractive Scalable Model with Significant Greenfield Opportunity: With a mix of franchise and corporate openings projected, the Company believes **BurgerFi has a strong pipeline for rapid expansion**, providing visible growth for the foreseeable future. New immediate-term locations are expected to include developments in BurgerFi's home state of Florida, as well as the Southeast, Mid-Atlantic and Northeast regions where there is high brand awareness.

(Emphasis added.)

126.    The Company's proxy materials also included an investor presentation which discussed the Company's growth strategy and noted that the Company was focused on growth through expansion of its "BurgerFi" branded locations. Nothing in the proxy materials indicated to investors that the growth of the post-Merger Company would be largely reliant on M&A activity, which would be high risk for BurgerFi.

127.    The above statements identified in ¶¶125-126 were materially false and misleading because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BurgerFi misrepresented to its pre-Merger investors what its growth strategy would be once the Merger was completed; and (ii) BurgerFi had overstated the effectiveness of its strategies for acquisition and growth. As a result, the Company's public statements were materially false and misleading at all relevant times.

***December 1, 2020 Proxy Statement***

128.    On December 1, 2020, OPES filed the Merger Proxy Statement with the SEC pursuant to Section 14(a) of the Exchange Act. Defendants Sternberg, Cordova Vera, Brain, Anderson, Byorum, and Greenfield (the "OPES Defendants") solicited the Merger Proxy

Statement, which contained material misstatements and omissions and failed to correct prior misstatements.

129.   The Merger Proxy Statement called for OPES shareholders to, *inter alia*: (1) approve the Merger; (2) approve the election of five directors, including Defendants Sternberg, Mann, and Greenfield, to the post-Merger Company's Board; and (3) approve the Plan, under which certain Individual Defendants would be eligible to receive material benefits.

130.   The purpose of the Plan was to "attract and retain persons eligible to participate in the [] Plan"; "motivate eligible individuals to whom awards under the [] Plan will be granted, who we refer to as the 'Participants,' by means of appropriate incentives, to achieve long-range goals"; "provide incentive compensation opportunities that are competitive with those of similar companies"; and "further align Participants' interests with those of [the Company's] other stockholders through compensation that is based on shares of Common Stock."

131.   The Merger Proxy Statement noted that the Plan "will remain in effect as long as any awards under [the Plan] remain outstanding, but no new awards may be granted after the tenth anniversary of the date on which the stockholders approve [the Plan]." Further, the Plan includes an annual limit for each non-employee director's total compensation. Under the Plan, the maximum annual total compensation, including the value of any awards made pursuant to the Plan, granted to a non-employee director in any calendar year may not exceed $500,000, provided that "such limit shall be $750,000 during the first year of service for a member of the Post-Closing Board of Directors who is not an employee [i.e., Defendants Greenfield and Mann]."

132.   In a section titled "Risks Related to BurgerFi's Growth Strategies and Operations," the Merger Proxy Statement stated the following, in relevant part:

BurgerFi operates in a highly competitive and ever-changing environment. Its long-term success is dependent on its ability to identify, develop and execute appropriate business strategies within this environment. BurgerFi's current strategies include:

- opening new domestic company-operated restaurants;

- innovating its digital products and capabilities;

- growing same-store sales;

- thoughtfully increasing its franchised restaurants; and

- capitalizing on its brand awareness.

BurgerFi may experience challenges in achieving the goals it has set and it may be unsuccessful in executing on its strategies once identified. BurgerFi may incur significant costs and damage its brand if it is unable to identify, develop and execute on appropriate business strategies, which could have a material adverse impact on its business and results of operations.

133.    In a section titled "Business of BurgerFi," the Merger Proxy Statement stated the

following:

*BurgerFi is a fast-casual "better burger" concept* with approximately 119 franchised and corporate-owned restaurants, *renowned for delivering an exceptional, all-natural premium burger experience in a refined, contemporary environment.* BurgerFi offers a classic American menu of premium burgers, hot dogs, crispy chicken, frozen custard, hand-cut fries, shakes, beer, wine and more. Originally founded in February 2011 by John Rosatti in sunny Lauderdale-by-the-Sea, Florida, the purpose was simple – redeFining the way the world eats burgers by providing an upscale burger offering, at a fast-casual price point. We've become the go-to burger restaurant for good times, and high-quality food across the United States and beyond. Known for delivering the all-natural burger experience in a fast-casual environment, BurgerFi is committed to an uncompromising and rewarding dining experience that promises fresh food of transparent quality.

*Today, BurgerFi is among the nation's fastest-growing better burger concepts* and was ranked as one of the Top 10 Fastest and Smartest-Growing Brands in Franchising and named a leader in its category by Franchise Times in their Fast and Serious list for both 2017 and 2018. BurgerFi was also featured in the fourth annual Chain Reaction antibiotic scorecard by National Resources Defense Council and Consumer Reports with an "A" rating – one of only two brands serving passing grade beef.

- 45 -

*Since its inception, BurgerFi has grown steadily—with approximately 119 BurgerFi restaurants, as of September 30, 2020, in 3 countries and 23 states, as well as Puerto Rico—and we continue to expand bringing the BurgerFi experience to new guests around the world.*

(Emphasis added.)

134.    The statements referenced in ¶¶132-133 were materially false and misleading because they failed to inform investors that a key part of the Company's growth strategy post-Merger would be through M&A activity—including by acquiring businesses which sold products and offerings different that those of BurgerFi—thereby subjecting BurgerFi to additional commodity fluctuation and other risk. In other words, OPES shareholders were misled to believe that the Merger would be prosperous for them because of Legacy BurgerFi's standing as a high-quality hamburger business. In reality, their investments in the post-Merger Company would be highly risky considering BurgerFi would engage in M&A activity shortly after the completion of the Merger, while BurgerFi was still growing and adding more of its restaurants nationwide.

135.    The Merger Proxy Statement explicitly maintained that the OPES Board unanimously supported the Merger after having "careful[ly] consider[ed]" the proposed Merger and found that the transactions solicited in the Merger Proxy Statement were "advisable, fair to, and in the best interests of, OPES and its stockholders." The OPES Board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy Statement.

136.    As a result of the material misstatements and omissions contained in the Merger Proxy Statement, Company shareholders voted to: (1) approve the Merger; (2) approve the Plan,

materially benefitting various of the Individual Defendants; and (3) elect Defendants Sternberg, Greenfield, and Mann to the Board.

137.    Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, OPES shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

**December 17, 2020 Press Release**

138.    On December 17, 2020, the Company issued a press release wherein it announced the completion of the Merger between OPES and Legacy BurgerFi, thereby forming BurgerFi. In relevant part, the press release stated:

> "We believe that combining OPES with BurgerFi will expand the better burger brand's growth nationally and internationally to reach new heights and create significant stockholder value," stated Ophir Sternberg, newly appointed Executive Chairman of BurgerFi. "As I step into my new role, there will be an important focus on taking advantage of the current real estate market to seek growth opportunities, as there is an abundance of prime retail locations with leases on very favorable terms. We will also continue our industry-leading technology development, enhancing user experience and increasing sales through our various online ordering channels."
>
> ***
>
> "Becoming a publicly traded company is the first of many important milestones we envision for BurgerFi, as our opportunities to evolve and develop are seemingly limitless," says Julio Ramirez, CEO of BurgerFi. "With our leading position as the preferred better burger restaurant in four out of five southern states, we will continue working our way up the eastern seaboard to the Mid-Atlantic and Northeast regions. Our corporate and franchise restaurant growth strategy will cluster in markets we've identified as strategically important, such as Atlanta, Nashville and Richmond."

**April 29, 2021 Press Release and Form 10-K**

139.    On April 29, 2021, BurgerFi issued a press release wherein it announced the Company's financial results for the fourth quarter and full year 2020. In relevant part, the press release stated:

> "As we move forward in 2021, we are eager to continue executing our growth strategy with a significant capital infusion from the closing of the business combination in December 2020. We have already opened four new locations including an additional drive-thru location in Nevada in March and we have eight more restaurants currently under construction. We are excited to bring the best 'better burger' experience to a broader customer base with plans to open approximately 30 locations in existing and new markets primarily throughout the Southeast and Mid-Atlantic regions in 2021. We are also continuing to grow internationally with plans to open our first location in Saudi Arabia during the fourth quarter as part of our multi-unit agreement with Food Supplies Co. We are confident in our financial position and ability to capitalize on the growth opportunities in the future."

> Commenting on the results, Ophir Sternberg, Executive Chairman of BurgerFi, stated: "I commend the entire organization's ability to not only adapt to the unprecedented challenges experienced this year in the food industry, but also the work being done to lay the foundation for growth as we embark into the new year. As I look at the number of BurgerFi's under development, the recent investments in digital capabilities, the unique expansion opportunities ahead and the bolstered management team and board, I believe that we are just beginning to tap into our true growth potential. We look forward to introducing consumers around the globe to our best-in-class menu."

140.    That same day, the Company filed its annual report on Form 10-K with the SEC for the 2020 Fiscal Year (the "2020 10-K"), which was signed by Defendants Sternberg, Greenfield, Mann, Ramirez, McGuire, and non-party Steven Berrard. Attached to the 2020 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Ramirez and McGuire attesting to the accuracy of the 2020 10-K.

141.    Regarding BurgerFi's growth strategies, the 2020 10-K stated the following, in relevant part:

- 48 -

In 2019, BurgerFi opened 15 new restaurants, resulting in the creation of approximately 450 jobs. During the year December 31, 2020 we have opened three company-owned restaurants, eight franchise restaurants and seven delivery-only licensed ghost kitchens.

*Traditional Company and Franchise Restaurant Development*

BurgerFi currently enjoys a larger geographic footprint than several of its "better burger" competitors, with significant growth headroom for new development in greenfield areas as well as clustering in existing markets.

Our goal is to strategically position new units to either cluster within existing markets or to build-out important new DMAs through multi-unit development. We believe BurgerFi is powerfully positioned with a pipeline of new units projected to open through 2021 and 2022 resulting from a combination of franchise and new corporate restaurant development.

A key indicator of the overall appeal and staying power of the BurgerFi model comes from existing multi-unit franchisees who continue to build on their initial successes by adding new BurgerFi units to their portfolio.

### May 19, 2021 Press Release

142.    On May 19, 2021, BurgerFi issued a press release wherein it announced the

Company's financial results for the first quarter of 2021. In relevant part, the press release stated:

"The first quarter of 2021 reflected our return to positive sales growth, achieved through unit growth and same store sales growth in both corporate owned restaurants and franchised locations," said Julio Ramirez, CEO of BurgerFi. "Our success demonstrates the continued momentum from the COVID-19 pandemic recovery, supported by growth in our number of locations, strong results from our digital channel, the execution of our marketing strategy and successful limited time offerings.["]

***

"For 2021, we will continue to execute on our restaurant development plan in both new and existing markets with plans to open approximately 30 restaurants this year. We opened four new restaurants in the first quarter, one in April and currently have 21 restaurants in various stages of development and plan to expand our Ghost Kitchens through our partnerships with Reef and Epic Kitchens through opening 15-20 additional locations by the end of 2021. We are looking forward to bringing the 'better burger' experience to more consumers nationwide and internationally as we continue to build our brand. With our ongoing brand recognition efforts, we remain committed to innovating our menu items with unique offerings, like our Swag Burger and Dunkaroo Shake, to drive further excitement with consumers. We

are optimistic about our expansion efforts on the eastern seaboard and internationally, and we anticipate that our growing presence will deliver strong results."

Commenting on the results, Ophir Sternberg, Executive Chairman of BurgerFi, stated: "BurgerFi started the year strong receiving multiple awards, including being named a top fast casual restaurant by USA Today's 10Best Readers' Choice Awards. An increasing number of people continue to be introduced to our best-in-class menu and we look forward to the continued expansion of the brand in 2021 through new restaurant openings. I am also excited that we have topped off our c-suite with our recent appointments of our chief financial, chief technology and chief marketing officers. With the great talent we have in place, we are well positioned for 2021 and beyond."

***August 12, 2021 Press Release and Earnings Call***

143.    On August 12, 2021, BurgerFi issued a press release wherein it announced the Company's financial results for the second quarter of 2021. In relevant part, the press release stated:

"Ophir Sternberg, Executive Chairman of BurgerFi, stated "The second quarter continued our trend of positive sales growth, driven by increases in same store sales, unit growth, and unit re-openings in both our corporate owned and franchised restaurants. We are particularly impressed with the performance of our corporate owned restaurants, whose sales have outperformed our 2019 levels despite a challenging operating environment. Our top-line growth reflects the continued momentum we are seeing in the Covid-19 recovery, as well as our new store openings and the successful execution of our marketing strategy and programs. Further, we are pleased that careful management of food and beverage costs and our leverage on occupancy costs more than fully offset significant wage pressure and scarcity costs."

Julio Ramirez, CEO of BurgerFi added "We continue to execute on our restaurant development plan as we expect to open between 25 and 30 new restaurants in existing and new markets primarily along the Eastern seaboard in 2021. During the second quarter, we opened 3 new company-owned locations and 1 franchised location, representing 8 new restaurants year-to-date. Further, we have over 18 additional new locations currently under various stages of construction and development. We are encouraged by the performance of our Ghost Kitchens and through our partnership with Reef and Epic Kitchens, we continue to expect the opening of 15 to 20 new Ghost Kitchen locations by the end of 2021."

144.    The same day, the Company held an earnings call with investors and analysts wherein in discussed BurgerFi's financial results for the second quarter of 2021 (the "2Q 2021 Earnings Call"). During the 2Q 2021 Earnings Call, Defendant Rabinovitch stated the following, in relevant part:

> We remain optimistic about our short-term and long-term prospects. We plan on opening 25 to 30 company and franchise operated restaurants in new and existing markets for the full year 2021. During the second quarter, we opened three new company owned locations and one franchise site, representing eight new restaurants year-to-date, further we have over 25 signed leases of which 18 restaurants are currently under various stages of construction and development. Most of the new locations are in markets we currently operate in and as a result, we're excited about continuing to build on the strengths and the brand in those areas.

145.    Also on the call, Defendant Ramirez stated:

> Now, I would like to talk about our strategic vision and the growth plans for our brand. Our first priority remains the guest experience. As dining rooms have reopened, we remain laser-focused on providing the guests with a seamless experience with fantastic tasting food. Further, we remain focused on off premise and digital dining, as we have optimized our digital and ordering solutions so that our guests can choose where and when they want to have their BurgerFi meal.

> Guests can order pickup and delivery through our BurgerFi mobile app, order through our own website, order from the largest third-party delivery providers in the marketplace. Additionally, to grow our brand in and outside of our existing markets, we have developed ecosystems in the form of delivery only Ghost Kitchens in various markets across the U.S. We are using these kitchens to gain entrance into certain markets where we don't have a physical presence. And more importantly, as well as providing added visibility and awareness in markets where we currently are growing. This allows us to test new growth opportunities, while building brand recognition and integrity without the large upfront fixed cost of opening a new restaurant.

### *October 11, 2021 Press Release*

146.    On October 11, 2021, the Company issued a press release titled "BurgerFi to Acquire Anthony's Coal Fired Pizza & Wings." In relevant part, the press release stated:

> With the acquisition of Anthony's, BurgerFi will have 177 systemwide restaurant

locations across the country through its two premium casual dining brands, with 61 Anthony's locations and 116 BurgerFi locations. "This is our first acquisition in building a premium multibrand platform. We are well positioned to continue the growth of our existing BurgerFi brand and leverage our scale to unlock value from strategic acquisitions. Our focus on premium fast-casual brands allows us to share expertise, capabilities and best practices across the board," said Ophir Sternberg, Executive Chairman of BurgerFi.

Anthony's, founded in 2002 and headquartered in Fort Lauderdale, FL, is a leading operator of casual dining pizza restaurants with a loyal fan base and, like BurgerFi, a high concentration of its locations in the state of Florida. Anthony's concept is centered around a 900-degree coal fired oven, and its streamlined menu offers "well-done" pizza, coal fired chicken wings, homemade meatballs, and a variety of handcrafted sandwiches and salads. Ian Baines, Chief Executive Officer of Anthony's, said "Anthony's Coal Fired Pizza & Wings will be a fantastic addition to the BurgerFi family.  It is a well-positioned, differentiated pizza and wing concept with industry-leading average unit volumes and strong profitability. BurgerFi is a very dynamic growth brand and I am honored to work with their great team as we continue to pursue and expand on our growth strategy together."

***November 4, 2021 Press Release***

147.    On November 4, 2021, the Company issued a press release wherein it announced the completion of the Anthony's Acquisition. In relevant part, the press release stated the following:

"We are very excited to officially welcome Anthony's into the BurgerFi family," continued Ophir Sternberg. "Anthony's is our first acquisition in our long term inorganic growth strategy to build a premium multibrand platform. It represents a fantastic complement to the BurgerFi brand, and we are well positioned to strategically grow Anthony's as it fits in our focus on high quality fast-casual dining restaurants. L Catterton was an excellent partner in finalizing this transaction, and we look forward to the strategic benefits of adding Andrew Taub, Managing Partner at L Catterton to our board."

Ian Baines, incoming Chief Executive Officer of BurgerFI, commented, "The acquisition of Anthony's marks the beginning of a new chapter for BurgerFi as we establish a restaurant platform well-positioned for growth and success. The BurgerFi and Anthony's brands are strategically aligned, bringing premium ingredients and loyal fanbases to fast-casual and casual dining restaurants. We are committed to our growth strategy here at BurgerFi, and will continue to scan the

market for potential M&A opportunities that we can leverage and unlock value from."

***November 11, 2021 Press Release and Earnings Call***

148.    On November 11, 2021, BurgerFi issued a press release wherein it announced the

Company's financial results for the third quarter of 2021. In relevant part, the press release stated:

> Ophir Sternberg, Executive Chairman of BurgerFi, stated "The third quarter continued the positive momentum for BurgerFi driven by strong sales growth resulting from the addition of new units, same-store sales growth, improved operating margins and continued unit re-openings in our franchise network. We are also excited to have closed on the acquisition of Anthony's Coal Fired Pizza & Wings on November 3, 2021, which we purchased from L Catterton for $156.6 million. We look forward to our ongoing strategic partnership with L Catterton as we set out on building this premium multi-brand platform as they have become one of BurgerFi's largest shareholders and Andrew Taub, Managing Partner at L Catterton, has joined our board."

> Ian Baines, who became Chief Executive Officer of the Company on November 8, 2021, added "***The Anthony's transaction is a historic moment for BurgerFi as it marks our first acquisition on our long- term growth strategy. We are thrilled to combine the BurgerFi and Anthony's brands and see enhanced profitability and growth opportunities as we look out over the next several years.*** We are encouraged by the sales and operational recovery in performance of both of our brands despite a very challenging operating environment. I have the utmost confidence in our management teams leading these brands as we begin the integration process, take advantage of strategic synergies and execute on the combined company strategy."

> Julio Ramirez, who became Chief Executive Officer and President of the BurgerFi brand on November 8, 2021, stated, "During the third quarter, we opened 2 corporate-owned restaurants, bringing our new restaurant count to 11 so far this year including one franchised location in October. Leases are signed for another 32 locations, 17 corporate owned and 15 franchised within our development pipeline, of which, 14 are in various stages of construction. While the restaurant industry is facing macro headwinds, we are resilient and continue to be proud of our operations teams and franchisee's focus leading through the challenges presented in this unprecedented time. I'm very pleased with the team's continued progress in driving improvements in restaurant operating margins through the effective management of price and cost programs and look forward to the benefits they will bring when challenges presented by COVID-19 subside."

- 53 -

(Emphasis added.)

149.   The same day, the Company held an earnings call with investors and analysts wherein in discussed BurgerFi's financial results for the third quarter of 2021 (the "3Q 2021 Earnings Call"). During the 3Q 2021 Earnings Call, Defendant Baines stated the following, in relevant part:

> We're excited to bring together these two fantastic brands. As a reminder, on November 3, 2021, BurgerFi closed on the transaction to purchase 61 company-owned premium casual dining locations operating under the name Anthony's Coal Fired Pizza & Wings for $156.6 million. Anthony's was a very attractive acquisition for BurgerFi given its strong profitability potential and top-tier unit economics, with the average unit volumes of 2.3 million sales -- $2.3 million; sales per square foot nearing $700 and 19% restaurant-level margins on a pre-COVID basis.
>
> In addition to Anthony's core restaurants, we see additional growth opportunities through a smaller concept footprint and a new virtual brand called The Roasted Wing. There is also a significant overlap in our geography with both brands having a strong foothold in the Florida market. ***Through this transaction, we aim to strengthen our profitability, and we expect this will be an accretive acquisition for [] BurgerFi and provide a solid foundation for additional growth***.

(Emphasis added.)

***January 10, 2022 Press Release***

150.   On January 10, 2022, the Company issued a press release wherein it provided a business update for the 2021 Fiscal Year and set an initial guidance for the 2022 Fiscal Year. In relevant part, the press release stated the following:

> Ophir Sternberg, Executive Chairman of BurgerFi, stated, "I am encouraged by the opportunities that lie ahead from the Anthony's acquisition and impressed by the speed of execution our refreshed management team is preparing Anthony's for integration into the BurgerFi system to begin realizing synergies. I am thrilled for the year ahead, and confident we now have the right management team in place to maximize the potentials of our two strong restaurant brands."

- 54 -

Ian Baines, Chief Executive Officer of BurgerFi, added, "In the fourth quarter, we focused on laying the groundwork for the efficient integration of Anthony's Coal Fired Pizza into our network, while navigating the challenges presented by the new Omicron variant on our core business. In 2022, we expect to begin to realize the synergies from the combination of the BurgerFi and Anthony's brands, providing improved financial performance and additional growth strategies. Lastly, we plan to continue our investment in technological advancements and innovation to provide our customers with a seamless omni-channel experience at all touch points. We are very excited to continue progressing on each vertical of our growth strategy here at BurgerFi in 2022, and I believe this will be a great year for the Company."

### April 14, 2022 Press Release and Form 10-K

151.   On April 14, 2022, BurgerFi issued a press release wherein it announced the

Company's financial results for the fourth quarter and full year 2021. In relevant part, the press

release stated:

Ophir Sternberg, Executive Chairman of BurgerFi, stated, "2021 was a fantastic year of growth and transformation at BurgerFi despite the many industry-wide effects of COVID-19. We were able to lay the foundation for significant growth through opening 16 BurgerFi restaurants and through the acquisition of Anthony's in November. I have the utmost confidence in our strengthened management team to execute on our business initiatives, maximize the potential of our two great restaurant brands, and deliver value to our shareholders as we head into 2022."

Ian Baines, Chief Executive Officer of BurgerFi, added, "The fourth quarter capped off a year of significant growth for BurgerFi. In the quarter, we initiated the integration of Anthony's into the BurgerFi system. The BurgerFi brand also performed strongly with a 23% growth in systemwide sales, driven primarily through new store openings and a 7% increase in same store sales. Of note, we retained nearly all of our digital channel sales when compared to peak COVID-19 levels, which is very encouraging. In 2022, we expect to realize $2 million in our first wave of cost synergies from the BurgerFi and Anthony's combination, with additional opportunity for 2023. We plan to expand access and convenience for our guests through continued investments in technological advancements, innovation and our digital ecosystem, accompanied by the 15 to 20 expected new BurgerFi brand restaurant openings we have planned for 2022. This unit growth and enhanced omni-channel customer experience, combined with the incredible food we offer should provide the foundation for an outstanding 2022."

152.     That same day, the Company filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"), which was signed by Defendants Baines, Rabinovitch, Sternberg, Stewart, Lopez-Blanco, Mann, Greenfield, and Taub. Attached to the 2021 10-K were SOX certifications signed by Defendants Baines and Rabinovitch attesting to the accuracy of the 2021 10-K.

153.     Regarding BurgerFi's overall business, the 2021 10-K stated the following, in relevant part:

> The Company is a leading multi-brand restaurant company that develops, markets and acquires fast-casual and premium-casual dining restaurant concepts around the world, including corporate-owned stores and franchises.
>
> ***
>
> *Anthony's*. Anthony's is a premium pizza and wing brand, operating 61 corporate-owned casual restaurant locations, as of December 31, 2021. Anthony's prides itself on serving fresh, never frozen, high-quality ingredients. The concept is centered around a 900-degree coal fired oven, and its menu offers "well-done" pizza, coal fired chicken wings, homemade meatballs, and a variety of handcrafted sandwiches and salads. The restaurants also feature a deep wine and craft beer selection to round out the menu. The pizzas are prepared using a unique coal fired oven to quickly seal in natural flavors while creating a lightly charred crust. Anthony's provides a differentiated offering among its casual dining peers driven by its coal fired oven, which enables the use of fresh, high-quality ingredients with quicker ticket times.
>
> Since its inception in 2002 in Ft. Lauderdale, Florida, the Anthony's brand has grown to 61 corporate-owned locations, as of December 31, 2021, primarily along the East coast and has restaurants in eight states, including Florida (28), Pennsylvania (12), New Jersey (8), New York (5), Massachusetts (4), Delaware (2), Maryland (1), and Rhode Island (1).
>
> Anthony's was named "The Best Pizza Chain in America" by USA Today's Great American Bites and "Top 3 Best Major Pizza Chain" by Mashed in 2021.
>
> Beyond our current brand portfolio, we intend to acquire other restaurant concepts that will allow us to grow and also offer additional food categories. In evaluating potential acquisitions, we specifically seek concepts with, among others, the following characteristics:

•established, recognized brands;
•long-term, sustainable operating performance;
•consistent cash flows; and
•growth potential, both geographically and through co-branding initiatives across our portfolio.

Intending to leverage our developing management platform, we expect to achieve cost synergies post-acquisition by reducing the corporate overhead of the acquired company. We also plan to grow the top line revenues of newly acquired brands through support from our management and systems platform, franchising, marketing and advertising, supply chain assistance, site selection analysis, staff training and operational oversight and support.

154.    Regarding BurgerFi's competitive strengths, the 2021 10-K stated the following, in

relevant part:

***Two Leading, Differentiated Brands Serving High-Quality, Freshly Prepared Foods with Broad Customer Appeal.*** Our BurgerFi and Anthony's brands are differentiated from other dining options and offer distinct concepts and fresh, natural menu choices that we believe have broad consumer appeal, which attract a diverse customer base and drive guest loyalty. BurgerFi and Anthony's are committed to our brand voice: serving freshly prepared, all-natural food using quality ingredients, including BurgerFi's American Wagyu beef and 100% natural, cage-free chicken from all-natural farms. At Anthony's, our 900-degree coal fired oven sets us apart from other premium pizza brands. At BurgerFi, we believe our premium wine and craft beer selection also differentiates us from the other fast-casual burger concepts. As such, we believe we are uniquely positioned to offer premium products at a premium price, including with chef-driven menu offerings, as well as eco-friendly restaurant design at the BurgerFi brand.

***

***Management Platform for Growth.*** We are developing a management and systems platform designed to support the expansion of our existing brands while enabling the efficient acquisition and integration of additional restaurant concepts. We dedicate our resources and industry knowledge to promote the success of our franchisees, offering them various support services such as marketing and advertising, supply chain assistance, site selection analysis, staff training and operational oversight and support. Furthermore, we are developing our platform to be scalable and adaptable, allowing us to incorporate new concepts into the Company with minimal incremental corporate costs. We intend to grow our existing brands as well as make strategic and opportunistic acquisitions that complement our existing portfolio of concepts providing an entrance into targeted restaurant segments.

- 57 -

155.    Regarding BurgerFi's growth strategies, the 2021 10-K stated the following, in relevant part:

Our long-term strategy is focused on profitably building our base brands and growing new distribution channels, including franchised locations and acquiring new concepts. We believe the Company's growth strategies primarily include the following:

***Opportunistically Acquire New Brands.*** We are developing a management platform to cost-effectively scale new restaurant concept acquisitions. Our recent acquisition of Anthony's is the first example of this growth strategy. We seek concepts with established, widely recognized brands; steady cash flows; stable relationships with franchisees; sustainable operating performance; and growth potential, both geographically and through co-branding initiatives across our portfolio.

***Enhance Existing Markets.*** We anticipate that our new and existing franchisees will continue to expand further as we focus our efforts on the franchise business, including our planned launch of the Anthony's franchise brand in 2022. We plan to leverage our position as a leading "better burger" and "premium pizza and wings" concept in Florida, as well as along the Eastern seaboard and other important markets in the Southeast, Mid-Atlantic, and Northeast. Many of our franchisees have grown their businesses over time, increasing the number of stores operated in their organizations. To capitalize on these relationships, we also hope to be able to cross-sell concepts across the Company's brands.

### *May 16, 2022 Press Release and Earnings Call*

156.    On May 16, 2022, BurgerFi issued a press release wherein it announced the Company's financial results for the first quarter of 2022. In relevant part, the press release stated:

Ophir Sternberg, Executive Chairman of BurgerFi, stated, "After a transformative year in 2021, we continued to effectively execute on our growth strategy in the first quarter of 2022 and remain well on track to deliver on our business targets for the fiscal year. We are pleased to have opened six new BurgerFi locations in the quarter positioning us to meet our growth target of 15-20 new BurgerFi locations in 2022. Further, we are encouraged by our performance as we grew our total revenues by more than 300% and drove over 200% in growth in adjusted EBITDA during the first quarter as compared to the prior year through the acquisition of Anthony's Coal Fired Pizza & Wings. I am excited about the synergies resulting from the acquisition by BurgerFi of Anthony's as it has provided access to greater

- 58 -

competencies between the two brands and leadership teams and expanded our addressable market for future growth."

Ian Baines, Chief Executive Officer of BurgerFi, added, "In the first quarter we built a solid foundation for growth for 2022. We saw a 20% growth in BurgerFi corporate restaurant sales driven by new store openings in the last year while, we continued to retain a significant portion of our digital sales. We were also very encouraged by the sales recovery in our Anthony's business, which produced year-over-year same-store sales growth of 13%. For the year, we are on track to achieve the previously guided $2.0 million in year cost synergies from the Anthony's transaction in November, and I am pleased to report that those synergies are expected to ramp up as we progress through 2022, which we expect will drive accelerated EBITDA in 2022. Despite the impact of the Omicron variant of COVID-19 in January, and the continued presence of labor and supply chain pressures, our expectations remain the same for the year and we are confident in reiterating our previous guidance for 2022. Given continued unit growth, our enhanced omni-channel customer experience, and anticipated cost savings, I believe we are on track for a fantastic 2022."

157.    The same day, the Company held an earnings call with investors and analysts to discuss BurgerFi's financial results for the first quarter of 2022 (the "1Q 2022 Earnings Call"). During the 1Q 2022 Earnings Call, Defendant Baines stated the following, in relevant part:

During the fourth quarter of 2021, BurgerFi completed its acquisition of Anthony's Coal Fired Pizza & Wings. So as such, the first quarter of 2022 marks the first quarter that I led the combined company as CEO. And we are enthusiastic about the way the teams are coming together, learning from each other, and our ability to realize our planned synergies and continue to grow our two strong brands. It's a very exciting time here at BurgerFi.

Anthony's was a very natural fit for BurgerFi as both brands have a strong foothold in the Florida market and other parts of the Southeast, which has created instant synergies. Further, Anthony's was a compelling opportunity given the brand's strong profitability -- profitability history and future potential and top-tier unit economics. In addition to the revenues and EBITDA contribution from Anthony's core restaurants, we see additional long-term growth opportunities through unlocking the franchising growth opportunity. The acquisition of Anthony's by BurgerFi has enhanced our profitability, provided access to greater competencies between the two brands and leadership teams and expanded our addressable market for future growth. The integration of Anthony's into the BurgerFi's system is going very well. and we are on track to realize $2 million in synergies in 2022, which is our first wave of the cost savings.

The acquisition of Anthony's provided us the necessary scale we needed to continue our strategy of building a strong multi-platform growth company in the fast casual and casual dining industries, and we are making significant progress towards that end. I'll now turn the call over to our CFO, Mike Rabinovitch, who will provide additional commentary on our performance for the first quarter 2022 financial results.

158.    The above statements identified in ¶¶138-157 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BurgerFi misrepresented to its pre-Merger investors what its growth strategy would be once the Merger was completed; (ii) BurgerFi had overstated the effectiveness of its strategies for acquisition and growth; (iii) BurgerFi had misrepresented to investors the purported benefits of the Anthony's Acquisition and its post-Anthony's Acquisition business and financial prospects; and (iv) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

159.    The truth began to emerge on August 11, 2022 when the Company issued a press release announcing its financial results for the second quarter of 2022. In the press release, the Company reported that revenue for the second quarter of 2022 was $45.3 million, ***missing consensus estimates by $2.28 million***. In relevant part, the press release stated:

Restaurant-level operating expenses for the second quarter of 2022 were $36.2 million compared to $8.0 million in the second quarter of 2021, the increase driven by the inclusion of a full quarter of Anthony's operations. For the BurgerFi brand, restaurant-level operating expenses, as a percentage of sales, increased 60 basis points for the second quarter of 2022, compared to the second quarter of 2021, primarily due to higher food, beverage and labor costs offset by significant savings in other operating expenses primarily driven by improved efficiency of the delivery service provider programs.

> *Net loss in the second quarter was $60.4 million compared to a net income of $9.0 million in the year-ago quarter. This loss is primarily the result of goodwill impairment charges of $55.2 million in relation to BurgerFi and Anthony's coupled with higher depreciation, amortization of intangibles, share-based compensation, interest expense resulting from the acquisition-related debt.*

(Emphasis added.)

160.    On this news, the Company's stock price fell $0.10 per share, or 3.03%, from a closing price of $3.30 per share on August 10, 2022 to close at $3.20 per share on August 11, 2022.

161.    The truth fully emerged on November 16, 2022 when the Company issued a press release announcing its financial results for the third quarter of 2022. In relevant part, the press release stated:

> Total revenue in the third quarter of 2022 increased 290% to $43.3 million [,] missing consensus estimates by $0.84 million,] compared to $11.1 million in the year-ago quarter, primarily driven by the addition of the Anthony's business acquired on November 3, 2021 and additional revenue from new restaurants opened during the period. For the BurgerFi brand, same-store sales decreased 11% and 6% in corporate-owned and franchised locations, respectively. For the Anthony's brand, same-store sales for the third quarter increased 3% over the prior year period.
>
> *Restaurant-level operating expenses for the third quarter of 2022 were $35.2 million compared to $7.8 million in the third quarter of 2021*, the increase driven by the inclusion of a full quarter of Anthony's operations. For the BurgerFi brand, restaurant-level operating expenses, as a percentage of sales, increased 370 basis points for the third quarter of 2022, compared to the third quarter of 2021, primarily due to losing leverage driven by lower sales. For the Anthony's brand, restaurant-level operating expenses, as a percentage of sales, improved 210 basis points for the third quarter of 2022, compared to the third quarter of 2021, primarily due lower food costs as we are beginning to see a stabilization of commodity costs, especially in chicken wing prices.

(Emphasis added.)

162.    On this news, the Company's stock price fell $0.24 per share, or 10.57%, from a closing price of $2.27 per share on November 15, 2022 to close at $2.03 per share on November

16, 2022. Notably, this marked a *$13.68 drop* from the price per share of the Company's stock at the close of trading the day the Merger was completed (i.e., December 17, 2020), further indicating that OPES significantly overpaid for its acquisition of Legacy BurgerFi pursuant to the Merger.

## DAMAGES TO BURGERFI

163.    As a direct and proximate result of the Individual Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars.

164.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Ramirez, Baines, McGuire, Rabinovitch, and Sternberg, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

165.    Such expenditures further include the amount OPES overpaid for Legacy BurgerFi due to the problems with Legacy BurgerFi described herein.

166.    Such expenditures include payments to the Individual Defendants under the Plan, which was approved at least in part due to the false and misleading statements issued or caused to be issued by the Individual Defendants.

167.    Such costs include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

168.    Such losses also include losses of revenue caused by customers' loss of trust in the Company's business.

169.    As a direct and proximate result of the Individual Defendants' conduct, BurgerFi has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

170.    Plaintiffs bring this action derivatively and for the benefit of BurgerFi to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' violations of Section 14(a) of the Exchange Act, breaches of fiduciary duties and other violations thereof, including aiding and abetting the same.

171.    BurgerFi is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

172.    Plaintiffs are, and have been at all relevant times, shareholders of BurgerFi. Plaintiffs will adequately and fairly represent the interests of BurgerFi in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

173.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

174.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following seven individuals: Defendants Sternberg, Greenfield, Stewart, Lopez-Blanco, Mann, and Taub (the "Director-Defendants"), and non-party David Heidecorn, (collectively, the "Directors"). Plaintiffs need only to allege demand futility as to four of these seven Directors.

175.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their engagement, either knowingly or recklessly, in the scheme alleged herein to make and/or cause the Company to make false and misleading statements and omissions of material fact while inflating net asset value, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

176.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted BurgerFi to issue materially false and misleading statements. Specifically, the Director-Defendants caused BurgerFi to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

177.    Additional reasons that demand on Defendant Sternberg is futile follow. Defendant Sternberg has served as the Executive Chairman of the Board since December 2020 and as a Company director since December 2020, positions for which he receives significant compensation from the Company, including compensation received under the Plan as set forth below and in Form 4s filed with the SEC. He also serves as a member of the Product & Innovation Committee. Thus, as the Company admits, he is a non-independent director. He previously served as CEO of OPES from June 2020 to October 15, 2020 and as one of its directors from October 2019 until December 2020. As OPES's CEO and one of its trusted directors, Defendant Sternberg was ultimately

responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he signed in the 2020 and 2021 10-Ks. As the trusted Board Chairman, Defendant Sternberg conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sternberg is a defendant in the Securities Class Action. For these reasons, Defendant Sternberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Greenfield is futile follow. Defendant Greenfield has served as a Company director since December 2020. Prior to the Merger, Defendant Greenfield served as a director of OPES from August 2020 until December 2020. She also serves as Chair of the Compensation Committee and the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Greenfield has received and continues to receive compensation for her role as a director as described above, including compensation received under the Plan as set forth below and in Form 4s filed with the SEC. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Greenfield signed the 2020 and 2021 10-Ks which contained false and

misleading statements. For these reasons, Defendant Greenfield breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Stewart is futile follow. Defendant Stewart has served as a Company director since February 2021. She also serves as Chair of the Product & Innovation Committee. Defendant Stewart has received and continues to receive compensation for her role as a director as described above, including compensation received under the Plan as set forth below and in Form 4s filed with the SEC. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Stewart signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Stewart breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Lopez-Blanco is futile follow. Defendant Lopez-Blanco has served as a Company director since July 2021. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. Defendant Lopez-Blanco has received and continues to receive compensation for her role as a director as described above, including compensation received under the Plan as set forth below and in Form 4s filed with the SEC. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false

and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Lopez-Blanco signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Lopez-Blanco breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Mann is futile follow. Defendant Mann has served as a Company director since December 2020. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Mann has received and continues to receive compensation for his role as a director as described above, including compensation received under the Plan as set forth above and in Form 4s filed with the SEC. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mann signed the 2020 and 2021 10-Ks which contained false and misleading statements. For these reasons, Defendant Mann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Taub is futile follow. Defendant Taub has served as a Company director since November 2021, following the completion of the Anthony's Acquisition. As a trusted Company director, he conducted little, if any, oversight of the

scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Taub signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Taub breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on the Board is futile follow.

184.    Defendants Sternberg, Stewart, Greenfield, Mann, and Lopez-Blanco received payments under the Plan as a result of the OPES Defendants' solicitation of the Merger Proxy Statement which called for shareholder approval of the Plan. Shareholders would not have approved the Plan had they known the true state of affairs at the Company or at Legacy BurgerFi. As a result of shareholder approval of the Plan, Defendants Stewart, Greenfield, and Mann each received at least $53,300 worth of stock awards during the 2021 Fiscal Year pursuant to the Plan. Defendants Stewart, Greenfield, Mann, and Lopez-Blanco also each received at least $165,608 worth of stock awards during the 2021 Fiscal Year and $103,175 worth of stock awards during the fiscal year ending December 31, 2023 from the Company pursuant to the Plan.[9] Similarly, Defendant Sternberg has received $2,665,000 worth of stock awards pursuant to the Plan since its

---

[9] Awards of 5,000 restricted stock units were granted to each of Defendants Stewart, Greenfield, and Mann under the Plan on July 13, 2021, when the Company's stock closed at a price of $10.66 per share. Awards of 26,455 restricted stock units were granted to each of Defendants Stewart, Greenfield, Mann, and Lopez-Blanco under the Plan on January 3, 2022, when the Company's stock closed at a price of $6.26 per share. Awards of 79,365 restricted stock units were granted to each of Defendants Stewart, Greenfield, Mann, and Lopez-Blanco under the Plan on January 3, 2023, when the Company's stock closed at a price of $1.30 per share.

approval.[10] As a result, Defendants Sternberg, Stewart, Greenfield, Mann, and Lopez-Blanco are beholden to the OPES Defendants and, thus, cannot be presumed to be disinterested in taking action against them. As such, demand upon Defendants Sternberg, Stewart, Greenfield, Mann, and Lopez-Blanco is futile and, therefore, excused.

185.    Moreover, Defendants Greenfield, Mann, and Lopez-Blanco served as members of the Audit Committee during the Relevant Period. In violation of the Charter, Defendants Greenfield, Mann, and Lopez-Blanco failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Greenfield, Mann, and Lopez-Blanco further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

186.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Ethics, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain

---

[10] According to the Form 4 Defendant Sternberg filed with the SEC on January 4, 2023, Defendant Sternberg received a grant of 250,000 restricted stock units made on December 16, 2020 under the Plan. The Form 4 noted that "[t]he legal grant date of the restricted stock units was July 13, 2021, the date that applicable grant award agreements were executed by the issuer and [Defendant Sternberg]." Because the Company's stock price at the close of trading on July 13, 2021 was $10.66 per share, Defendant Sternberg received approximately $2,665,000 worth of BurgerFi stock pursuant to the Plan.

the accuracy of Company records; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

187.    BurgerFi has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for BurgerFi any part of the damages BurgerFi suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

188.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

189.    The acts complained of herein constitute violations of fiduciary duties owed by BurgerFi's officers and directors, and these acts are incapable of ratification.

190.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of BurgerFi. If there is a directors' and officers'

liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of BurgerFi, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

191.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause BurgerFi to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the OPES Defendants for Violations of Section 14(a) of the Exchange Act**

193.    Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph one hundred ninety-three (193).

194.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

195.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

196.    Under the direction and watch of the Individual Defendants, the Merger Proxy Statement failed to disclose, *inter alia*: (i) BurgerFi misrepresented to its pre-Merger investors what its growth strategy would be once the Merger was completed; and (ii) BurgerFi had overstated the effectiveness of its strategies for acquisition and growth. As a result, the Company's public statements were materially false and misleading at all relevant times.

197.    The Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, including but not limited to, the Plan.

198.    As a result of the material misstatements and omissions contained in the Merger Proxy Statement, Company shareholders elected Defendants Sternberg, Greenfield, and Mann to the Board, allowing them to breach their fiduciary duties to the Company. Furthermore, as a result of the material misstatements and omissions in the Merger Proxy Statement, Company shareholders approved the Merger and the Plan, among other proposals.

199.    As a further result of the material misstatements and omissions in the Merger Proxy Statement, Company shareholders were deprived of their right to make an informed decision in voting on the Merger, were deprived of their right to make an informed redemption decision regarding their OPES shares prior to the Merger, and were induced to accept inadequate consideration for the Merger.

200.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy Statement.

201.    Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

## SECOND CLAIM

### Against the OPES Defendants for Breach of Fiduciary Duties

202.    Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph two hundred two (202)

203.    Each of the OPES Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

204.    Each of the OPES Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The OPES Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The OPES Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

206.    In breach of their fiduciary duties, the OPES Defendants caused the Company to engage in the Overpayment Misconduct.

207.    In further breach of their fiduciary duties, the OPES Defendants made false and misleading statements and omissions and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

208.    Also in breach of their fiduciary duties, the OPES Defendants caused the Company to fail to maintain internal controls.

209.    The OPES Defendants had actual or constructive knowledge of the Overpayment Misconduct and the materially false and misleading statements that enabled it, and they failed to correct the Company's public statements and representations. The OPES Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

210.     The OPES Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The OPES Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The OPES Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

211.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.     As a direct and proximate result of the OPES Defendants' breaches of their fiduciary obligations, BurgerFi has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the OPES Defendants are liable to the Company.

213.     Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

214.     Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph two hundred fourteen (214).

215.    By their wrongful acts, violations of law, and/or false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BurgerFi.

216.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from BurgerFi that was tied to the performance or artificially inflated valuation of BurgerFi, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

217.    Plaintiffs, as shareholders and representatives of BurgerFi, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.    Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

219.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph two hundred nineteen (219).

220.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BurgerFi, for which they are legally responsible.

221.   As a direct and proximate result of the Individual Defendants' abuse of control, BurgerFi has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.   Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

223.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph two hundred twenty-three (223).

224.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BurgerFi in a manner consistent with the operations of a publicly held corporation.

225.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, BurgerFi has sustained and will continue to sustain significant damages.

226.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

227.     Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

**SIXTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

228.     Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this paragraph two hundred twenty-eight (228).

229.     As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

230.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

231.     Plaintiffs on behalf of BurgerFi have no adequate remedy at law.

**SEVENTH CLAIM**

**Against Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch for Contribution Under Sections 10(b) and 21D of the Exchange Act**

232.        Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred ninety-two (192) as though fully set forth herein for this

paragraph two hundred thirty-two (232).

233.    BurgerFi and Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sternberg's, Ramirez's, Baines's, McGuire's, and Rabinovitch's willful and/or reckless violations of their obligations as officers and/or directors of BurgerFi.

234.    Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch, because of their positions of control and authority as officers and/or directors of BurgerFi, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of BurgerFi, including the wrongful acts complained of herein and in the Securities Class Action.

235.    Accordingly, Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

236.    As such, BurgerFi is entitled to receive all appropriate contribution or indemnification from Defendants Sternberg, Ramirez, Baines, McGuire, and Rabinovitch.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of BurgerFi,

and that Plaintiffs are adequate representatives of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BurgerFi;

(c)   Determining and awarding to BurgerFi the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing BurgerFi and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BurgerFi and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of BurgerFi to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding BurgerFi restitution from the Individual Defendants, and each of them;

(f)   Awarding Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

> (g) Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this 30th day of August, 2023.

**LAW OFFICE OF JOSE D. SOSA, P.C.**
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: (561) 670-8237
E-Mail: pepe@pepesosalaw.com
sosalaw@yahoo.com

/s/ *JOSE D. SOSA*
JOSE D. SOSA
Florida Bar No.: 150878

and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein and Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Attorneys for Plaintiffs*

- 81 -